## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Nichole Williams, Johnson Sendolo,
Carey Koppenberg, Carrie Strohmayer,
on behalf of themselves and all others
similarly situated,

                      Plaintiffs,                **MEMORANDUM OPINION**
                                                                                                   **AND ORDER**
          v.                                                Civil No. 09-1959 ADM/JJG

Timothy F. Geithner, as United States
Secretary of the Treasury, U.S. Department
of the Treasury, The Federal Housing
Finance Agency, as Conservator for the
Federal National Mortgage Association,
d/b/a Fannie Mae and the Federal Home
Loan Mortgage Corporation, d/b/a Freddie
Mac, Federal National Mortgage
Association, d/b/a Fannie Mae, Federal
Home Loan Mortgage Corporation, d/b/a
Freddie Mac, Ocwen Loan Servicing, LLC,
GMAC Mortgage, f/d/b/a Homecomings
Financial, and U.S. Bank,

                      Defendants.

_____

Mark R. Ireland, Esq., Jane N. Bowman, Esq., and Timothy L. Thompson, Esq., Housing
Preservation Project, St. Paul, MN, on behalf of Plaintiffs.

Bradley H. Cohen, Esq., U.S. Department of Justice, Washington, D.C., on behalf of Defendants
Secretary Timothy F. Geithner and the U.S. Department of the Treasury.

Mark A. Jacobson, Esq., Mark H. Zitzewitz, Esq., and Bryan R. Freeman, Esq., Lindquist &
Vennum, P.L.L.P., Minneapolis, MN; Howard N. Cayne, Esq., David B. Bergman, Esq., and
David D. Fauvre, Arnold & Porter, LLP, Washington, D.C; Stephen E. Hart, Esq., Federal
Housing Finance Agency, Washington, D.C. on behalf of Defendant Federal Housing Finance
Agency.

Patrick S. Williams, Esq., Briggs & Morgan, PA, Minneapolis, MN; Seth P. Waxman, Esq., and
Noah A. Levine, Esq., Wilmer Cutler Pickering Hale and Dorr, LLP, New York, NY on behalf
of Defendant Federal National Mortgage (d/b/a Fannie Mae).

Michael C. McCarthy, Esq., and Emily M. Rome, Esq., Maslon Edelman Borman & Brand, LLP, Minneapolis, MN; Michael J. Ciatti, Esq., King & Spalding LLP, Washington, D.C.; Hyacinth G. Kucik, Esq., Graham H. Kidner, Esq., Chante Bowser, Esq., Federal Home Loan Mortgage Corporation, Washington, D.C. on behalf of Defendant Federal Home Loan Mortgage Corporation (d/b/a Freddie Mac).

Wendy J. Wildung, Esq., Eleasalo V. Ale, Esq., David R. Stras, Esq., Jennifer Y. Dukart, Esq., and Emily E. Chow, Esq., Faegre & Benson, Minneapolis, MN on behalf of Defendant GMAC Mortgage, LLC.

David A. Applebaum, Esq., Leonard, Street and Deinard, P.A., Minneapolis, MN; Brian P. Brooks, Esq., O'Melveny & Myers LLP, Washington, D.C. on behalf of Defendant Ocwen Loan Servicing, LLC.

___

## I. INTRODUCTION

On October 15, 2009, the undersigned United States District Judge heard oral argument on the Motion for Preliminary Injunction [Docket No. 2] of Plaintiffs Nichole Williams, Johnson Sendolo, Carey Koppenberg, and Carrie Strohmayer, on behalf of themselves and all others similarly situated (collectively "Plaintiffs").  Counsel for Defendants Timothy F. Geithner ("Secretary") and the United States Department of the Treasury ("Treasury"), Defendant Federal Housing Finance Agency ("FHFA"), Defendant Federal National Mortgage Association, d/b/a Fannie Mae ("Fannie Mae"), Defendant Federal Home Loan Mortgage Corporation, d/b/a Freddie Mac ("Freddie Mac"), Defendant Ocwen Loan Servicing ("Ocwen"), and Defendant GMAC Mortgage, f/d/b/a Homecomings Financial ("Homecomings Financial") appeared in opposition to Plaintiffs' Motion.  For the reasons set forth below, Plaintiffs' Motion for Preliminary Injunction is denied.

## II. BACKGROUND

**A.     The HAMP Program**

On October 3, 2008, Congress passed the Emergency Economic Stabilization Act (the "Act"). 12 U.S.C. § 5201 (2008). The Act allocated $700 billon to Treasury to restore liquidity and stability to the financial system; one of its goals was to "preserve homeownership." Id. The Act also established the Troubled Asset Relief Program, which was intended to reduce foreclosures. 12 U.S.C. §§ 5211, 5225 (2008). Sections 109 and 110 of Title I of the Act provide, in pertinent part:

> Section 109.  Foreclosure Mitigation Efforts.
>
> a. RESIDENTIAL MORTGAGE LOAN SERVICING STANDARDS. To the extent that the Secretary acquires mortgages, mortgage backed securities, and other assets secured by residential real estate, including multifamily housing, the Secretary shall implement a plan that seeks to maximize assistance for homeowners and use the authority of the Secretary to encourage the servicers of the underlying mortgages, considering net present value to the taxpayer, to take advantage of the HOPE for Homeowners Program under section 257 of the National Housing Act or other available programs to minimize foreclosures. In addition, the Secretary may use loan guarantees and credit enhancements to facilitate loan modifications to prevent avoidable foreclosures.
> . . . .
>
> c. CONSENT TO REASONABLE LOAN MODIFICATION REQUESTS. Upon any request arising under existing investment contracts, the Secretary shall consent, where appropriate, and considering net present value to the taxpayer, to reasonable requests for loss mitigation measures, including term extensions, rate reductions, principal write downs, increases in the proportion of loans within a trust or other structure allowed to be modified, or removal of other limitation on modifications.
> . . . .
>
> Section 110.  Assistance to Homeowners.
>
> . . . .
>
> IN GENERAL. To the extent that the Federal property manager holds, owns, or controls mortgages, mortgage backed securities, and

> other assets secured by residential real estate, including multifamily housing, the Federal property manager shall implement a plan that seeks to maximize assistance for homeowners and use its authority to encourage the servicers of the underlying mortgages, and considering net present value to the taxpayer, to take advantage of the HOPE for Homeowners Program under section 257 of the National Housing Act or other available programs to minimize foreclosures.

Enabled with this authority, Treasury, FHFA, Fannie Mae, and Freddie Mac created the Making Home Affordable Program on February 18, 2009, which consists of two components: (1) the Home Affordable Refinance Program, and (2) the Home Affordable Modification Program (the "HAMP"), the program at issue in this dispute.

The HAMP is aimed to financially assist three to four million homeowners who have defaulted on their mortgages or who are in imminent risk of default by reducing monthly payments to sustainable levels. Bowman Aff., [Docket No. 9], Ex. B at 1 (Treasury Supplemental Directive 09-01 describing the HAMP and eligibility requirements, hereinafter referred to as "SD 09-01"). The HAMP works by providing financial incentives to participating mortgage servicers[1] to modify the terms of eligible loans. See Maggiano Decl. [Docket No. 83] ¶ 16. Treasury provides guidance to servicers by defining the class of borrowers who are eligible for a loan modification and setting forth specific modification protocols. SD 09-01 at 2, 8-10.

---

[1] Mortgages that are owned, securitized, or guaranteed by Fannie Mae or Freddie Mac, as well as mortgages owned by private servicers, may participate in the HAMP. Servicer participation is voluntary.

Treasury Guidelines specify several "threshold criteria"[2] to define the class of eligible borrowers:

- The loan is a first-lien mortgage originated on or before January 1, 2009;
- The loan is secured by a one-to-four unit property, one unit of which is the borrower's principal residence;
- The property has not been abandoned or condemned;
- The current unpaid principal balance is no greater than specified limits ($729, 750 for a one-unit property)
- The loan is delinquent or default is reasonably foreseeable;
- The borrower has a monthly mortgage payment greater than 31 percent of monthly income, and has insufficient assets to make the payment; and
- The borrower documents a financial hardship.

SD 09-01, at 2-3.

If the borrower meets the threshold criteria, the Treasury Guidelines enumerate a sequence of steps (the "waterfall") servicers must apply, in the prescribed order, to achieve a "target monthly mortgage payment," defined as 31 percent of the borrower's gross monthly income. SD 09-01 at 8-10. The waterfall sequence requires servicers to first determine the total debt by capitalizing certain costs (delinquent interest, taxes, insurance escrows, and third party fees) in the unpaid principal balance and then to (1) reduce the interest rate in increments of .125

---

[2] The eligibility criteria for mortgages owned by Fannie Mae or Freddie Mac are generally consistent but vary slightly from the criteria for mortgages owned by private servicers because Fannie Mae and Freddie Mac can authorize modifications that a servicer may not have authority to approve. There are additional criteria not included in the above list.

percent down to a 2.0 percent floor, (2) extend the term and reamortize the loan by up to 480 months from the effective date of the modification, (3) forbear (but not forgive) a portion of the principal, and transform it into a balloon payment that must be paid either at maturity or upon payoff. Id.

The Treasury Guidelines explain that "participating servicers are required to consider all eligible mortgage loans unless prohibited by the rules of the applicable [pooling and servicing agreement] and/or other investor servicing agreements." Id. at 1. The Guidelines provide:

> All loans that meet the [HAMP] eligibility criteria and are either deemed to be in imminent default (as described above) or 60 or more days delinquent must be evaluated using a standardized NPV [net present value] test[3] that compares the NPV result for a modification to the NPV result for no modification. If the NPV result for the modification scenario is greater than the NPV result for no modification, the result is deemed 'positive' and the servicer MUST offer the modification. If the NPV result for no modification is greater than NPV result for the modification scenario, the modification result is deemed 'negative' and the servicer has the option of performing the modification in its discretion.

Id. at 4. Therefore, although an applicant may be eligible in the sense of meeting the threshold criteria, servicers are not required to modify a loan with a negative NPV or if otherwise prohibited by the investor.

If the loan qualifies for a modification after consideration of all the aforementioned factors, the servicer is obligated to provide a trial period loan modification. Id. If the borrower remains current throughout the trial period, the servicer must then provide a loan modification.

---

[3] The NPV is essentially an accounting calculation to determine whether it is more profitable to modify the loan or allow the loan to go into foreclosure. See generally, Exhibit 4, Base NPV Model Overview. The calculation compares the probability that the mortgage defaults and the estimated loss to the servicer given foreclosure with the cash flow generated if the loan is modified. See id. at 2-3. Servicers are permitted to customize the NPV model to fit their unique loan portfolios. Id. at 1.

Id. at 17-18.

The Treasury Guidelines advise borrowers denied loan modifications to contact servicers who "must also have procedures and systems in place to be able to respond to inquiries and complaints about the [HAMP]. Servicers should ensure that such inquiries and complaints are provided fair consideration, and timely and appropriate responses and resolution." Id. at 13. Specifically, borrowers denied a loan modification can contact the Homeowner's HOPE Hotline and speak with a trained housing counselor regarding the HAMP program. Maggiano Decl. ¶ 37. If the counselor believes that the borrower's application was improperly denied, the counselor can refer the concern to the servicer's senior-level management. See id. ¶¶ 37-39. If that senior-level official cannot resolve the issue, the counselor can further escalate the case to a designated team at Fannie Mae whose responsibility includes resolving individual and systemic problems. See id. ¶ 39. In addition, to monitor participating servicers' compliance with the HAMP, Freddie Mac, at the direction of Treasury, instituted a second-look process in which it audits a sample of loan modification applications that have been denied to minimize the likelihood that borrower applications are overlooked or inadvertently denied. Id. ¶ 31. Finally, in response to growing concerns about the servicers' failure to provide adequate reasons for a loan modification denial, the Secretary of the Treasury issued SD 09-06 which requires, in part, servicers to furnish Treasury and Fannie Mae with the specific reason for denial.[4] Attachment to Memo in Opposition filed by Treasury [Docket No. 106], Ex. 5 at 16.

**B.    The Parties**

---

[4] Treasury Supplemental Directive 09-06 enumerates 13 reasons for a loan modification denial. Each reason corresponds to a code that specifies why a borrower was not offered or accepted into a trial plan. These codes were expected to become functional on or about October 1, 2009. At oral argument, Treasury's counsel indicated he believed these codes were operational.

The United States Department of the Treasury, through its Secretary, is the executive agency responsible for promulgating the rules of the federal program at issue in this case. FHFA is a federal agency that supervises and regulates housing finance and also serves as the Conservator for Fannie Mae and Freddie Mac. Fannie Mae and Freddie Mac are private companies chartered by Congress that support the secondary mortgage market by purchasing residential mortgages from private mortgage lenders and then holding or selling those mortgages. Ocwen and Homecomings Financial are private loan servicers. Defendants are referred to individually by name and collectively as "Defendants."

Plaintiff Nichole Williams ("Williams") purchased a home in 2004 and refinanced her mortgage the following year. Williams Aff. [Docket No. 6] ¶ 2. She was employed as a legal assistant but was laid-off in 2007. Id. at ¶ 6. Unable to make her monthly mortgage payment, Williams contacted the servicer of her mortgage, Homecomings Financial. She requested but was denied a loan modification pursuant to the HAMP. See id. at ¶¶ 10, 23. Although her mortgage is delinquent, Homecomings Financial has not initiated foreclosure proceedings. See id. at ¶ 25. Williams purports to represent a class of people who are delinquent on their mortgage payments, have applied for and been denied a loan modification, but whose loan servicers have not yet taken foreclosure action.

Plaintiff Johnson Sendolo ("Sendolo") purchased a home in 2005. Sendolo Aff. [Docket No. 5] ¶ 2. In September 2008, he lost his job and ceased making mortgage payments several months later. Id. at ¶¶ 7-9. He contacted Ocwen, the servicer of his mortgage, seeking a loan modification pursuant to the HAMP, but his request was denied. Id. at ¶¶ 10, 13. On June 25, 2009, Sendolo's home was sold at a Sheriff's sale. Id. at ¶ 18. Sendolo has until December 25,

2009, to redeem the property by paying the loan balance in full; his failure to do so will result in Ocwen reclaiming the property. See Minn. Stat. §§ 581.10, 581.12 (2008). Sendolo purports to represent a class of people who are delinquent on their mortgage payments, have applied for and been denied a loan modification, and whose homes have been sold at a foreclosure sale and whose statutory right of redemption period has not yet expired.

**C.     Plaintiffs' Claims**

Having been denied loan modifications, Plaintiffs Williams and Sendolo allege a violation of their constitutional right to procedural due process. Plaintiffs argue that the history and requirements of the HAMP demonstrate that Congress intended to provide a particular benefit to homeowners facing foreclosure, and, therefore, Defendants are required to provide that benefit in accordance with Plaintiffs' constitutional rights. Specifically, Plaintiffs contend that Defendants' failure to provide written notification of an adverse decision and an opportunity for appeal deprives them of due process of law in violation of the United States Constitution. Plaintiffs seek an injunction of all foreclosures by Defendants in Minnesota until the HAMP's constitutional infirmities are resolved.

### III. DISCUSSION

**A.     Preliminary Injunction**

The Eighth Circuit held in Dataphase Systems, Inc. v. C L Systems, Inc. that a district court deciding a motion for a preliminary injunction must balance four factors: (1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between the harm to the movant and the harm that the relief would cause to the other litigants; and (4) the public interest. 640 F.2d 109, 114 (8th Cir. 1981)

(en banc). "A preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant." Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) (citation omitted).

  **1.  Likelihood of Success on the Merits**

When considering whether to grant a preliminary injunction seeking to stay government action taken in the public interest pursuant to a statute or regulatory scheme, courts require "a substantial likelihood" rather than merely a "fair chance" that the moving party will prevail on the merits. Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds, 530 F.3d 724, 731-32 (8th Cir. 2008) (en banc) (citing Able v. United States, 44 F.3d 128, 131 (2d Cir. 1995)). This rigorous standard reflects the notion "that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." Able, 44 F.3d at 131. Once the moving party satisfies its threshold showing likelihood of success on the merits, only then should courts consider the other Dataphase factors. See Planned Parenthood, 530 F.3d at 732.

  To prevail on their due process claim, Plaintiffs must first show a deprivation of a protected liberty or property interest. See Board of Regents of State Colleges v. Roth, 408 U.S. 564, 570 (1972). Plaintiffs argue that the HAMP provides two benefits that constitute property interests: (1) the temporary suspension of foreclosure pending a determination on the homeowner's loan modification application and, (2) the right to receive a loan modification. If these benefits are protected property interests, the protections of due process apply. See id. at 570-71.

10

The <u>Roth</u> court explained that a protected property interest arises if a person has

> more than an abstract need or desire for [a benefit]. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.

<u>Id</u>. at 577. Such entitlements "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." <u>Id</u>. When a statute or policy grants to the decisionmaker discretionary authority in its implementation, a protected property interest is not created. <u>Jennings v. Lombardi</u>, 70 F.3d 994, 996 (8th Cir. 1995).

The relevant "rules or understandings" here are the Act, the Treasury Guidelines, the contracts between and among the Defendants, and Minnesota foreclosure law. Plaintiffs argue that these rules and understandings use mandatory language and impose significant, substantive restrictions on a servicer's decision-making authority so as to create a protected property interest. Specifically, Plaintiffs rely on (1) the language in 12 U.S.C. § 5219 (c), which states, "the Secretary shall consent, where appropriate, and considering net present value to the taxpayer, to reasonable requests for loss mitigation measures" and (2) the provisions in the Treasury Guidelines circumscribing the servicers' ability to change elements of the NPV calculation.

For a number of reasons, the Court concludes the regulations at issue here did not intend to create a property interest in loan modifications for mortgages in default. First, the statute does not create an absolute duty on the part of the Secretary to consent to loan modifications; it is not

11

"language of an unmistakably mandatory character." Hill v. Group Three Housing Development Corp., 799 F.2d 385, 392 (1986) (describing rules or understandings that may create a protected property interest) quoting Hewitt v. Helms, 459 U.S. 460 (1983). Notably, the statute provides that loans may be modified "where appropriate" - a phrase that limits the Secretary's obligation and evinces a Congressional intent to afford discretion in the decision whether to modify loans in certain circumstances.

Next, Congress dictated that requests for loan modifications necessarily consider the NPV to the taxpayer. Thus loan modifications are not an entitlement, but are linked to decisions that result in profits to taxpayers. Congress did not intend to mandate loan modifications.[5]

Third, regulations promulgated by Treasury for administering the HAMP clearly demonstrate that the Secretary allowed the exercise of some discretion, including calculation of the NPV, to the servicers. The calculation of the NPV is obviously not left to the servicers' unfettered discretion; the Treasury Guidelines' language circumscribing the extent of the servicers' discretion to define some elements of the NPV calculation is not alone sufficient to create a property interest in light of the broad discretion afforded to servicers in the modification process. See Hill, 799 F.2d at 391.

---

[5] The statements by members of Congress who felt that the HAMP did not go far enough underscore this point: "[t]he central flaw of [EESA] is that there are no stronger protections for homeowners and no changes in the language to ensure that the secretary has the authority to compel mortgage servicers to modify the terms of mortgages . . . . We could have demanded language in the legislation that would have empowered the Treasury to compel mortgage servicers to rework the terms of mortgage loans so homeowners could avoid foreclosure." 154 Cong. Rec. H10766 (statement of Rep. Kucinich); and "section 109 . . . should be changed from 'shall encourage' to 'shall require' to provide stronger relief for Americans. Specifically, current section 109(a) states in pertinent part that the 'the Secretary shall implement a plan that seeks to maximize assistance for homeowners and use the authority of the Secretary to encourage the servicers of the underlying mortgages . . . to minimize foreclosures.' I believe if the true intent is to bailout 'Main Street,' the Secretary should be 'required' to minimize foreclosures. 154 Cong. Rec. H10778 (statement of Rep. Jackson-Lee).

Among the variables servicers must use to calculate the NPV are the discount rate (an interest rate used to convert future payment or receipts into present value), the default rate (the rate at which borrowers default on the loan), and the re-default rate (the rate at which borrowers default after a loan modification). Servicers have considerable discretion in deciding what values to assign to these rates. The Federal Deposit Insurance Corporation's (FDIC) Loan Modification Program guidelines cited by Plaintiffs indicate that these variables are "servicer and/or portfolio specific." Second Ireland Aff. [Docket No. 98], Ex. A at 14. Further evidence of the discretionary intent afforded servicers is found in the Treasury Guidelines. For example, they provide that "[d]efault rates may vary significantly from one large servicer to another based on differences in their portfolios. Therefore, allowing servicers *flexibility* to use rates that reflect their own portfolio experience should result in more accurate evaluations of proposed modifications." Attachment to Memo in Opposition filed by Treasury [Docket No. 106], Ex. 4 at 4 (emphasis added). They further state that "[i]n the base NPV model, all servicers are permitted *limited discretion* to adjust the discount rate by up to 250 basis points because different investors may place different values on future payments versus payments received today." Id. (Emphasis added). While Plaintiffs may be correct that the NPV calculation is merely an objective mathematical formula, assigning values to certain variables within the formula are largely within each servicers' discretion, rather than significantly and substantively constrained.

And finally, a finding of no protected property interest recognizes the economic reality facing servicers. Loan servicers seek to maximize their investments, and in doing so, make profitability determinations between modification or foreclosure, based in part on predictions about an individual borrower's likelihood of default. If the Secretary prescribed the exact

criteria all servicers must use to determine whether a loan has a positive NPV (and therefore should be modified if the other criteria are satisfied) then servicers may choose to forego participating in the HAMP program so that they are not forced to modify loans that do not make financial sense. While Congress required the Secretary to implement a plan to assist distressed homeowners, that plan not only made servicer participation voluntary, but also afforded to program participants discretion on several variables that impact the NPV determination.

Based on the above, Plaintiffs do not have a legitimate claim of entitlement to a loan modification. Thus, the HAMP does not provide Plaintiffs with a "protected property interest," the denial of which must comport with due process protections.

### 2. Other Dataphase Factors

Having found no constitutionally protected property interest in loan modifications, Plaintiffs are unable to show any likelihood of success on the merits of their due process claim. Accordingly, the Court finds it unnecessary to assess the remaining Dataphase factors for injunctive relief. See Planned Parenthood, 530 F.3d at 732.

### IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Both parties' post-hearing submissions related to Treasury Supplemental Directive 09-08 ("SD 09-08") are received by the Court and are of record;[6]

---

[6] SD 09-08 requires that borrowers "be informed in writing of the reasoning for servicer determinations regarding program eligibility." Plaintiffs acknowledge that SD 09-08 "resolves many of the procedural due process issues presented in this matter." Plaintiffs' November 6, 2009 letter. While the Court concludes that the HAMP as administered prior to the promulgation of SD 09-08 did not give rise to a constitutional violation, Treasury's issuance of SD 09-08 tends to alleviate the constitutional objections raised by Plaintiffs.

2. Plaintiffs' Motion for Preliminary Injunction [Docket No. 2] is **DENIED**;

3. Because Plaintiffs' Motion for Preliminary Injunction seeks solely injunctive relief based on an alleged violation of procedural due process[7] and the Court denies such relief, the Amended Complaint [Docket No. 25] is **DISMISSED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: November 9, 2009.

---

[7] Plaintiffs' requested relief for costs and attorneys' fees under 28 U.S.C. § 2412 (2008) requires them to be deemed a prevailing party which they are not given the Court's ruling. Thus, Plaintiffs' request for costs and attorneys' fees fails as well.